**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **MANHEIM AUTOMOTIVE FINANCIAL** ) | |
| **SERVICES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| **v.** ) | **No. 06-2298-KHV** |
| ) | |
| **MARTIN E. GUTHRIE, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

**MEMORANDUM AND ORDER**

Manheim Automotive Financial Services, Inc. ("Manheim") brings suit against Marten E.
Guthrie, individually and d/b/a Guthrie Wholesale Auto, Dena P. Guthrie and Oklahoma Auto
Exchange, LLC. ("Oklahoma Auto"), asserting claims arising from a floor plan financing
arrangement.  Specifically, Manheim sues Oklahoma Auto for conversion (Count IV) and civil
conspiracy (Count V).[1]  This matter comes before the Court on Plaintiff's Motion For Partial
Summary Judgment Against Defendant Oklahoma Auto Exchange As To Liability And
Compensatory Damages On Count IV (Conversion) (Doc. #55) filed July 3, 2007 and Oklahoma
Auto's Motion For Summary Judgment Against Plaintiff As To Sole Remaining Count IV
(Conversion) And Count V (Civil Conspiracy), And Brief In Support ("Oklahoma Auto's Brief")
(Doc. #58) filed July 13, 2007.  For reasons stated below, the Court overrules both motions.

---

[1]     Manheim originally asserted claims against Marten E. Guthrie and Dena P. Guthrie
for breach of contract (Count I), breach of personal guaranties (Counts II and III) and fraud (Count
VI).  On February 22, 2007, the Court entered default judgment on those claims in the amount of
$140,345.62.  See Doc. #32.

## I.      Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."  Anderson, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion,

and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P. 56(e).  Rule 56(e) also requires that "copies of all papers or parts thereof referred to in an affidavit be attached thereto or served therewith."  To enforce this rule, the Court ordinarily does not strike affidavits but simply disregards those portions which are not shown to be based upon personal knowledge or otherwise do not comply with Rule 56(e).  Maverick Paper Co. v. Omaha Paper Co., 18 F. Supp.2d 1232, 1234-35 (D. Kan. 1998).

## II.    Facts

The following facts are either undisputed or, where disputed, each party's contention is noted:[2]

Marten E. Guthrie ("Guthrie") worked as a used car dealer, doing business as "Guthrie Wholesale Auto."  Guthrie bought cars at wholesale auctions and re-sold them at other wholesale auctions and from his dealership lot, which was located in Kansas.  In conducting such business, Guthrie routinely pledged his inventory to floor plan financiers.  At all relevant times, Oklahoma

---

[2]        The Court does not consider facts which the record does not support.  In addition, the Court does not consider facts which the parties include only in the argument section of their briefs and not in the statement of facts as required by D. Kan. Rule 56.1.  The Court also does not consider additional facts contained in opposing memoranda which are not set forth in separately numbered paragraphs as required by D. Kan. Rule 56.1(b)(2).

3

Auto knew this information.

Prior to February of 2006, Manheim provided floor plan financing to Guthrie pursuant to loan documents which included a security agreement, a promissory note and individual guaranties by Guthrie and Dena Guthrie. The security agreement secured any indebtedness by Guthrie to Manheim and gave Manheim a security interest "in all Vehicle inventory, parts and accessories inventory, equipment, fixtures, accounts, holdback reserves, manufacturer rebates, and incentive programs, general intangibles of [Guthrie] now owned and hereafter acquired . . . all chattel paper, documents, instruments, monies, residues and property of any kind related to the foregoing." Suggestions In Opposition To Plaintiff's Motion For Summary Judgment Regarding Claim Of Conversion ("Oklahoma Auto's Response") (Doc. #60) filed July 24, 2007, Exhibit 1 at ¶ 5. The agreement further provided that Manheim could "obtain and retain the certificate of title in its possession until any vehicle is sold by Borrower and Borrower's obligation is paid in full." Id. Prior to February of 2006, Manheim filed with the Kansas Secretary of State a financing statement against Guthrie.

On December 6, 2005, Guthrie and Oklahoma Auto entered into a written joint venture agreement to acquire cars to be sold at auctions by Oklahoma Auto. Oklahoma Auto and Guthrie agreed to evenly split gains and losses. Oklahoma Auto authorized Guthrie to buy and sell automobiles under its name at any member auction and guaranteed payment for such transactions. Pursuant to the agreement, Guthrie acquired eleven cars.[3] Oklahoma Auto believed that Guthrie had

---

[3]    The record does not reflect the date on which Guthrie acquired the cars. Guthrie acquired the following cars: 1997 Cadillac (last VIN numbers: 838151); 2002 BMW (last VIN numbers: P48196); 1997 Cadillac (last VIN numbers: 820048); 2000 BMW (last VIN numbers: A87438); 2000 Honda (last VIN numbers: 021151); 2002 Cadillac (last VIN numbers: 230575); 2003 Cadillac (last VIN numbers: 159102); 1999 Mazda (last VIN numbers: 811276); 1996 Cadillac (last VIN numbers: 807448); 2003 Cadillac (last VIN numbers: 122820); 1998 Volvo (last VIN
(continued...)

paid too much for the cars and that it would have to take a loss on them.

On February 27, 2006, Oklahoma Auto agreed to sell the eleven cars to Guthrie at its facility in Oklahoma City.  On the back of the certificate of title for each car, Oklahoma Auto completed an assignment to Guthrie. The assignments did not indicate that Oklahoma Auto retained any lien or other interest in the automobiles.  In exchange for the assignments, Guthrie delivered post-dated checks.   The parties orally agreed that the sale was conditional upon financing by Guthrie. Oklahoma Auto agreed to hold the checks, understanding that Guthrie planned to take the car titles to a floor plan lender and obtain loan proceeds to cover the checks, at which time Oklahoma Auto would deposit them.[4]  Oklahoma Auto knew that Guthrie did not have funds to cover the checks and that the money would come from Guthrie's floor plan lender in exchange for the car titles.[5] Oklahoma Auto understood that after Guthrie pledged the cars to his floor plan financier, he would re-sell the cars and have 100 per cent stake in any profit or loss thereon.  Guthrie took two of the cars with him and understood that he had the right to sell any of the eleven cars at any point thereafter. Guthrie never intended to take the cars to his retail lot.  Rather, he planned to transport them directly from Oklahoma Auto to other auctions, and to keep them at Oklahoma Auto while deciding where

---

[3](...continued)
numbers: 45164).

[4]      The parties dispute when the deal between Guthrie and Oklahoma Auto was to be completed.  Oklahoma Auto contends that the parties agreed that it would be complete after the financed funds were deposited in its bank account.  See Oklahoma Auto's Brief (Doc. #58) filed July 13, 2007 at 4, ¶ 6.  Manheim contends that the parties agreed that the deal would be done after Guthrie deposited the money in his own account.  See Plaintiff's Memorandum In Opposition To Defendant Oklahoma Auto Exchange, LLC's Motion For Summary Judgment ("Manheim's Opposition") (Doc.#62) filed August 6, 2007 at 4, ¶ 6.

[5]      Oklahoma Auto did not file a financing statement against Guthrie with the Kansas Secretary of State.

to sell them.

On the day that Guthrie agreed to buy the eleven cars from Oklahoma Auto (February 27, 2006), he took one of the cars and the eleven certificates of title to Manheim's authorized dealer in Kansas City and obtained financing in the amount of $129,770.  In addition to the car titles, Guthrie provided documents which indicated that Oklahoma Auto had sold him the cars.[6]  Manheim provided a check written to "Guthrie Wholesale Auto," which Guthrie deposited in his "Guthrie Wholesale Auto/Martin Guthrie" bank account.  Before loaning the money, Manheim did not physically inspect the eleven cars or contact Oklahoma Auto.  Manheim did not know that Oklahoma Auto remained unpaid or that Oklahoma Auto claimed any interest in the eleven cars.[7]

After Guthrie obtained financing, he wrote a letter to Mike Clopton, general manager and co-owner of Oklahoma Auto, stating that he could not get the cars "floored," i.e. that he could not get financing for the cars.[8]  See Clopton Deposition at 82:18-24, Attachment 2 to Memorandum In Support Of Plaintiff's Motion For Partial Summary Judgment Against Defendant Oklahoma Auto Exchange As To Liability And Compensatory Damages On Count IV (Conversion) ("Manheim's Memorandum") (Doc. #56) filed July 3, 2007.  Clopton called Guthrie and asked where the car titles were.  Guthrie replied that the titles were being "held" and that Clopton would need to get duplicate

---

[6]     Oklahoma Auto did not prepare the sale documents.  Oklahoma Auto contends that Manheim should have known that no sale occurred because the bills of sale were unsigned and did not reflect any sales price.  See Oklahoma Auto's Response (Doc. #60) at 5-6, ¶ 16.

[7]     The record is unclear what interest, if any, Oklahoma Auto retained in the eleven cars.  Oklahoma Auto contends that it retained ownership of the cars.  Manheim contends that at most, Oklahoma Auto retained an unperfected security interest.

[8]     The record does not reflect when Guthrie wrote the letter.  The letter identified five cars which Guthrie had in his possession or at other auctions which he proposed to return to Oklahoma Auto.

titles.[9] Id. at 83:14-21.  Guthrie did not say (and Clopton did not ask) who was holding the titles, id. at 83:23-24, 85:16-21, and Clopton did not try to find out what Guthrie had done with them.

In March of 2006, Oklahoma Auto applied for duplicate titles to the eleven cars.  In so doing, Oklahoma Auto implied that it owned the cars and that the original titles had been lost or stolen.[10] After obtaining duplicate titles, Oklahoma Auto re-sold the eleven cars at auctions for a total of $109,365.[11]

When Manheim learned that Oklahoma Auto had sold the cars, it demanded possession or payment for their value.  By letter dated May 3, 2005, Manheim explained its purported rights to

---

[9]     Guthrie and Clopton gave conflicting testimony regarding their conversation about the car titles.  Gurthrie testified that he said that "the Feds have the titles."  Guthrie Depo. at 187:15-188:20.  Clopton testified that Guthrie stated that the titles were being held, but that he did not say who was holding them.  See Clopton Depo. at 83:14-84:4, 85:13-21.

[10]     The record does not contain a copy of Oklahoma Auto's application for duplicate titles, and is unclear how Oklahoma Auto made such implications.  In response to Oklahoma Auto's summary judgment motion, Manheim asserts additional facts that Oklahoma Auto filed an application for duplicate titles, "falsely implying ownership of the Eleven Automobiles and that the original titles had been lost or stolen, even while Guthrie told Clopton that the titles were 'being held.'"  Manheim's Opposition (Doc. #62) at 11, ¶ 27.  Oklahoma Auto did not controvert the statement in its reply brief.  See Defendant Oklahoma Auto Exchange, LLC's Reply To Plaintiff's Response To Motion For Summary Judgment (Doc. #65) filed August 29, 2007.

[11]     Although the record is unclear, it appears that Guthrie returned the two cars which he took with him on February 27, 2006.  Oklahoma Auto sold the following cars: 1997 Cadillac (last VIN numbers: 838151) to Best Way Auto on March 22, 2006 for $3,615.00; 2002 BMW (last VIN numbers: P48196) to Elite Used Cars on March 7, 2006 for $22,210.00; 1997 Cadillac (last VIN numbers: 820048) to Car Gallery on March 15, 2006 for $3,565.00; 2000 BMW (last VIN numbers: A87438) to Ben's Auto Sales on March 8, 2006 for $9,160.00; 2000 Honda (last VIN numbers: 021151) to Page Motor Company on March 8, 2006 for $4,275.00; 2002 Cadillac (last VIN numbers: 230575) to Eagle Cars on March 28, 2006  for $19,300.00; 2003 Cadillac (last VIN numbers: 159102) to Gwartney Ford on March 7, 2006 for $25,230.00; 1999 Mazda (last VIN numbers: 811276) to Topline Auto Sales on March 8, 2006 for $3,615.00; 1996 Cadillac (last VIN numbers: 807448) to Hill Country Cars on March 8, 2006 for $3,515.00; 2003 Cadillac (last VIN numbers: 122820) to Gwartney Ford on March 7, 2006 for $12,675.00; 1998 Volvo (last VIN numbers: 045164) to A&G Auto, Inc. on March 8, 2006 for $2,205.00.

Oklahoma Auto.  It stated in part as follows:

> * * * under the Uniform Commercial Code, [Manheim] prevails in ownership of the cars no matter what your arrangement with Guthrie and no matter what action you have taken with the titles.  When Guthrie put the cars on his floorplan with [Manheim] and [Manheim] gave Guthrie money in exchange for a security interest, [Manheim] became a good faith purchaser for value.  See KS Stat. Ann. § 84-2-403 (giving good faith purchaser for value or buyer in ordinary course title over prior owner); Okla. Stat. 12A § 2-403 (same); KS Stat. § 84-1-201(32) (defining "purchase" to include taking of security interest); Okla Stat. § 2A-103(1)(v) (same).
>
> Whether his invoices were authentic or not, [Manheim] had no reason to doubt them at the time Guthrie sought to finance the vehicles, especially when Guthrie also presented titles.  It is well-known in the car industry that a wholesale owner does not release titles without getting payment in some form. * * *

Exhibit 22 to Oklahoma Auto's Response (Doc. #60).  Clopton did not know of Manheim's involvement with Guthrie until after he received a call from a Manheim representative.[12]  Clopton did know that Guthrie was planning to interact with his floor plan financier (although he did not know the identity thereof).

After receiving the letter from Manheim, Oklahoma Auto deposited Guthrie's checks, which the bank returned for insufficient funds.[13]

Guthrie is in default on his loan from Manheim.

In ordinary auction sales, Oklahoma Auto does not release title until it receives payment from the buyer.  This is standard practice in the wholesale auto industry, and buyers, auctions and lenders customarily rely on certificates of title as proof of ownership.  Oklahoma Auto routinely receives payments from floor plan lenders and understands how they operate.

---

[12]     The record does not reflect when the call occurred.

[13]     Counsel advised Oklahoma Auto to try to cash the checks so that it could show in legal proceedings that the checks were no good.  Oklahoma Auto otherwise had no intention of depositing the checks.

### III.      Analysis

Manheim asserts that Oklahoma Auto is liable for conversion and civil conspiracy. Specifically, with regard to conversion, it claims that it had an interest in the eleven cars which was superior to any interest of Oklahoma Auto. <u>Pretrial Order</u> (Doc. #49) at 16-17.[14] Manheim contends that by obtaining duplicate titles, selling the cars and retaining the proceeds, Oklahoma Auto appropriated the cars to its own use and exercised a right of ownership to the exclusion of Manheim's "superior rights" in the cars. <u>Id.</u> at 17. With regard to civil conspiracy, Manheim claims that Guthrie and Oklahoma Auto conspired to obtain floor plan financing to cover Guthrie's post-dated checks and that in furtherance of the conspiracy, Guthrie committed an unlawful act, <u>i.e.</u> falsely represented that he had valid, unencumbered title to the eleven cars. <u>See id.</u> at 17-18. Both parties seek summary judgment on the conversion claim. In addition, Oklahoma Auto seeks summary judgment on the civil conspiracy claim.

### A.      Conversion

Conversion is "the unauthorized assumption or exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights." <u>Moore v. State Bank of Burden</u>, 240 Kan. 382, 386, 729 P.2d 1205, 1210 (1986); <u>see also</u> <u>Steenbergen v. First Fed. Sav. & Loan of Chickasha</u>, 753 P.2d 1330, 1332 (Okla. 1987).[15] The taking of property or money which

_____

[14]      The pretrial order does not articulate the type of "interests" to which plaintiff refers. <u>See</u> <u>Pretrial Order</u> (Doc. #49) at 16-17. In its factual contentions, Manheim asserts that Guthrie represented that he had full ownership of the cars and that it had a perfected security interest in Guthrie's vehicles pursuant to his existing floor plan credit line. <u>See id.</u> at 13.

[15]      The parties dispute whether Kansas law or Oklahoma law applies to this claim. <u>See</u> <u>Pretrial Order</u> (Doc. #49) filed June 20, 2007 at 3. The parties agree, however, that Oklahoma law controls the priority of their interests in the eleven automobiles. <u>See id.</u> In light of this stipulation,
(continued...)

is subject to a prior perfected security interest constitutes conversion.  See, e.g., First Nat'l Bank of Bethany v. Am. Gen Fire & Cas. Co., 927 F.2d 1126, 1128 (10th Cir. 1991) (applying Oklahoma law); Millennium Fin. Servs., LLC v. Thole, 31 Kan. App.2d 798, 808, 74 P.3d 57, 64 (2003); Farmers & Merchants Nat'l Bank v. Fairview State Bank, 766 P.2d 330, 334 (Okla. 1988).  Good faith is not a defense to a charge of conversion.  See In re Marcotte, 243 Kan. 190, 194, 756 P.2d 1091, 1095 (1988).  Rather, the intent required for conversion is satisfied merely by the use or disposition of property which belongs to another.  See id.; see also Shelby v. Hudiburg Chevrolet, Inc., 361 P.2d 275, 278-79 (Okla. 1961) (where conversion proved, plaintiff entitled to recover irrespective of defendant's good faith, care or knowledge) (citing U.S. Zinc Co. v. Colburn, 255 P.688, Syl. ¶ 2 (Okla. 1927)).

Manheim contends that Oklahoma Auto is liable for conversion because it sold eleven cars in which it had a "superior interest."  Oklahoma Auto responds that it is not liable because it never relinquished ownership of the cars and it therefore owned the cars at the time it sold them.  Both parties seek summary judgment on this claim.

**1.      Manheim's Motion For Summary Judgment On Conversion Claim**

Manheim asserts that as a matter of law, Oklahoma Auto is liable for conversion because it sold eleven cars in which Manheim had a "superior interest."  Manheim's Memorandum (Doc. #56) at 11.  Manheim asserts that it is entitled to summary judgment based on four reasons: (1) it had a security interest in the cars; (2) under U.C.C. Section 2-401(1), any interest of Oklahoma

---

[15](...continued)
the Court discerns no material difference between the applicable substantive law in Kansas and Oklahoma with regard to the conversion claim.  Accordingly, it need not resolve the choice of law issue at this time.  See Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1284 (10th Cir. 1997).

Auto was at most an unperfected security interest;[16] (3) because Oklahoma Auto authorized Guthrie to pledge the cars, it cannot claim any interest under U.C.C. Section 9-315(a)(1) or equitable estoppel principles; and (4) Manheim qualifies as a good faith purchaser under 12A Okl. St. Ann. § 9-315(a)(1).   Manheim contends that as a matter of law, each argument independently demonstrates its superior interest in the cars and that Oklahoma Auto is therefore liable for conversion.  The Court will consider each argument in turn.

> **a.     Whether Manheim Is Entitled To Summary Judgment Because It Had A Security Interest In The Cars**

Manheim argues that it obtained a security interest in the eleven cars because Guthrie owned them when he pledged them to Manheim by delivering the titles.  Manheim offers no analysis regarding how it obtained a security interest in the cars.  See Manheim's Memorandum (Doc. #56) at 12-14.  Rather, it refers generally to facts that Guthrie pledged the car titles under the parties' security agreement and that it had previously filed a U.C.C. financing statement against Guthrie's vehicle inventory.  See id. at 11, 14, 18.  Manheim offers no analysis regarding the language of the security agreement or any legal authority which allegedly gave rise to a security interest.[17]  Under the U.C.C., a security interest becomes enforceable against the debtor and third parties if (1) value has been given; (2) the debtor has rights in the collateral or power to transfer rights in the collateral; and (3) inter alia, the debtor has authenticated a security agreement which

---

[16]     In 1961, Oklahoma adopted the Uniform Commercial Code ("U.C.C."), see 12A Okl. St. Ann. §§ 1-101 to 11-107, which applies to transactions in goods.  See 12A Okl. St. Ann. § 2-102.  "Goods" include "all things . . . which are moveable at the time of identification to the contract...." 12A Okl. St. Ann. § 2-105.

[17]     The Court will not construct legal arguments for the parties.  See e.g., Moore v. Bd. of County Comm'rs of County of Leavenworth, 470 F. Supp. 1237, 1250 (D. Kan. 2007).

provides description of collateral.  <u>See</u> 12A Okl. Stat. Ann. § 1-9-203(b).  Manheim's argument focuses solely on the second element, <u>i.e.</u> whether Guthrie owned the cars which he pledged.  <u>See</u> <u>Manheim's Memorandum</u> (Doc. #56) at 12-14.

Manheim argues that as a matter of law, Guthrie owned the cars because according to Clopton, the sale would be complete when the loan proceeds hit Guthrie's bank account.  Manheim contends that the sale was complete, and ownership passed to Guthrie, when Guthrie received the loan proceeds in his bank account.  Oklahoma Auto contends that the sale was conditioned upon Guthrie obtaining financing and paying the funds to Oklahoma Auto, which did not occur.  In ruling on Manheim's summary judgment motion, the Court must construe that factual record in a light most favorable to Oklahoma Auto as the non-moving party.  So construed, the record reveals a genuine issue of material fact regarding the effective date of the sale and whether ownership effectively passed to Guthrie.  On this record, Manheim has not established that as a matter of law, Guthrie owned the cars when he pledged them as collateral.

Manheim argues that Guthrie owned the cars because under Oklahoma law, a certificate of title constitutes proof of ownership.  In support of its argument, Manheim cites Oklahoma motor vehicle statutes which state that the owner of every motor vehicle shall possess a certificate of title as proof of ownership.  <u>See</u> 47 Okl. St. Ann. §§ 1103 and 1105(B).  Those statutes, however, do not establish that a certificate of title constitutes conclusive proof of ownership.  Manheim cites <u>Mitchell</u> <u>Coach Mfg. Co. v. Stephens</u>, 19 F. Supp.2d 1227, 1234 (N.D. Okla. 1998), for the proposition that a certificate of title creates a "presumption" of ownership in a motor vehicle.  <u>Manheim's</u> <u>Memorandum</u> (Doc. #56) at 13-14.  Again, this authority does not support Manheim's contention that a certificate of title constitutes conclusive proof of ownership.  On this record, Manheim has not

shown that Guthrie owned the eleven cars or that it acquired a security interest therein.  Manheim

is not entitled to summary judgment on this ground.

### b.      Whether Manheim Is Entitled To Summary Judgment Based On U.C.C. Section 2-401(1)

Manheim asserts that it had a superior interest in the cars based on U.C.C.

Section 2-401(1), because any interest which Oklahoma Auto retained was limited to an unperfected

security interest which was inferior to Manheim's perfected security interest.  See Manheim's

Memorandum (Doc. #56) at 14-15.  This argument is fatally flawed.  As discussed above, Manheim

has not shown that it had a valid security interest in the cars.  Moreover, even if it had shown a

security interest in the cars, it has not shown that (1) Oklahoma Auto's interest in the cars was

limited to an unperfected security interest, or (2) that any such interest was inferior to a security

interest retained by Manheim.

Manheim relies on 12A Okl. St. Ann. § 2-401(1), which states as follows:

> * * * Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.  Subject to these provisions and to the provisions of the article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

12A Okl. St. Ann. § 2-401(1).[18]  By its terms, this section applies to goods which are "shipped or

delivered to the buyer."  Thus, to the extent cars were shipped or delivered to Guthrie, it appears that

Section 2-401(1) might apply.  The undisputed facts establish that Guthrie took two cars with him

on February 27, 2006.  As to those two cars, under Section 2-401(1), it appears that Oklahoma

---

[18]      According to the Oklahoma Code Comment, the question of who has title is unimportant under the U.C.C.; the remedies of buyer and seller, the placement of risk and the rights of creditors are detailed specifically, without reference to title.  See Oklahoma Code Comment to 12A Okl. St. Ann. § 2-401.

Auto's interest could be limited to a security interest.  The record, however, is unclear whether Guthrie took possession of the remaining cars, whether he returned the two cars to Oklahoma Auto, or how Oklahoma Auto came to possess (and re-sell) the eleven cars.[19]  Oklahoma Auto contends that it retained possession of nine cars pending payment by Guthrie.  Construed in the light most favorable to the non-moving party, the record reveals a genuine issue of material fact whether Oklahoma Auto delivered the cars to Guthrie.  If not, Section 2-401(1) would not apply and Oklahoma Auto's interest in the cars would not be limited to a security interest.

Even if Oklahoma Auto's interest in the cars were limited to a security interest, Manheim offers no analysis to support its assertion that the security interest was unperfected, or that its security interest was superior to that of Oklahoma Auto.  See Manheim's Memorandum (Doc. #56) at 14 (citing 12A Okl. St. Ann. § 1-9-322(a)(2)).  A proper analysis of this issue involves the interrelation of several U.C.C. provisions.  See, e.g., 12A Okl. St. Ann. § 1-9-110 (until debtor obtains possession of goods, filing not required for perfection, rights of secured party governed by Article 2 and security interest has priority over conflicting security interest created by the debtor); 12A Okl. St. Ann. § 1-9-309 (security interest arising under § 2-401(1) perfects when it attaches); 12 Okl. St. Ann. § 1-9-322(f)(4) (subsections (a) through (e) subject to § 1-9-110 regarding security interests arising under Article 2).  Manheim makes no attempt to discuss these provisions.  On this record, Manheim has not shown that it is entitled to summary judgment based on Section 2-401(1).

> **c.      Whether Manheim Is Entitled To Summary Judgment Under U.C.C. Section 9-315(a)(1) And Equitable Estoppel Principles**

Manheim asserts that it had a superior interest in the vehicles under U.C.C.

---

[19]      Guthrie's letter to Clopton identified five cars which Guthrie had in his possession or at other auctions which he proposed to return to Oklahoma Auto.

Section 9-315(a)(1) and equitable estoppel principles.  Specifically, it asserts that because Oklahoma Auto authorized Guthrie to pledge the cars to obtain financing, Oklahoma Auto is bound to that pledge and is equitably estopped from claiming an ownership interest in the cars.[20]

Under its first argument, Manheim asserts that to the extent Oklahoma Auto retained a security interest in the cars,[21] it relinquished that interest pursuant to Section 9-315(a)(1).  That section provides as follows:

> Except as otherwise provided in this article and in paragraph (2) of Section 2-403 of this title . . . a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien[.]

12A Okl. St. Ann. § 1-9-315(a)(1).  Manheim argues that Oklahoma Auto relinquished its security interest because it specifically authorized Guthrie to pledge the cars to obtain financing.[22]  This may be true, but Manheim has not shown as a matter of law that it obtained a valid security interest and/or other ownership interest in those cars.  Accordingly, Manheim is not entitled to summary judgment on this ground.

Manheim asserts that to the extent Oklahoma Auto retained ownership of the cars, Manheim's interest is superior based on equitable estoppel principles.  Although Manheim does not articulate what interest it claims in the cars under this theory, based on the context of the cases which

---

[20]    Manheim does not articulate what type of interest in the cars it asserts under this theory.

[21]    As discussed above, Oklahoma Auto may have retained a security interest in any cars to which Guthrie took possession.  A material question of fact exists in this regard, but construed in the light most favorable to Oklahoma Auto, the record supports an inference that Guthrie took possession of two cars and Oklahoma Auto retained a security interest in those two cars.

[22]    Manheim does not address whether it or Oklahoma Auto had a security interest in proceeds from the vehicles.

it cites, it appears to be that of a bona fide purchaser.  Manheim cites <u>Central Nat'l Bank & Trust Co.</u> <u>of Enid v. Community Bank & Trust Co. of Enid</u>, 528 P.2d 710, 713 (Okla. 1974), and <u>Holbird v.</u> <u>Harris</u>, 174 P.2d 262 (Okla. 1946).[23]  Both cases were decided after a trial on the merits, and neither demonstrates that Manheim is entitled to judgment as a matter of law.

In <u>Central Nat'l Bank</u>, the Oklahoma Supreme Court found that unless particular statutory provisions displace them, equitable estoppel principles apply to transactions arising under the U.C.C. <u>See</u> <u>Central Nat'l Bank</u>, 528 P.2d at 713.  The trial court found that one bank's negligence, <u>i.e.</u> its failure to file its lien in the name shown on the certificate of title, was responsible for another bank's determination that no prior lien existed on an automobile.  <u>See id.</u>  The trial court also found that reasonable diligence by the second bank would not have revealed the first bank's mistake.  <u>See id.</u> Under such circumstances, the trial court applied the "two innocent persons" principle as follows:

> Where one of two innocent parties must suffer through the act or negligence of a third party, the loss should fall on the one who by his conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss.

<u>Id.</u> (quoting <u>Bankers Inv. Co. v. Humphrey</u>, 369 P.2d 608, 609 (Okla. 1962)).  The Oklahoma Supreme Court affirmed, finding that the trial court had correctly applied the equitable principle on

---

[23]     Manheim also cites <u>West v. Roberts</u>, 143 P.3d 1037 (Colo. 2006).  In that case, plaintiff sold her car to a third party, who paid with a counterfeit cashier's check and re-sold the car to defendant.  Plaintiff sought to recover the car from defendant based on a Colorado criminal statute which permits the rightful owner of stolen property to recover the property from possession of another.  The Colorado Supreme Court, however, found that the stolen property statute did not apply where the owner of the property voluntarily intended to part with the property.  Instead, the court held that U.C.C. § 2-403 applied.  Specifically, the court found that even where delivery was procured through criminal fraud, plaintiff passed voidable title to the third party, who passed good title to defendant as a good faith purchaser.  <u>See West</u>, 143 P.3d at 1043-44.

    Manheim cites <u>West</u> for the proposition that "[t]he original seller is better positioned to take precautions to prevent loss than a later purchaser."  <u>Id.</u> at 1046.  <u>See Manheim's Memorandum</u> (Doc. #56) at 17.  The Court does not disagree with this statement, but it does not show that Manheim is entitled to judgment as a matter of law on this record.

the facts of that case.  See id.

In Holbird, the Oklahoma Supreme Court found that based on trial evidence, plaintiff was entitled to judgment as a matter of law.  In exchange for a loan to a third party, based on the third party's representation that he owned certain property, plaintiff had taken a secured interest in the property.  Specifically, the third party had presented a bill of sale which stated that defendant had sold the property to him.[24]  Defendant retained possession of the property, however, and claimed ownership.  The Oklahoma Supreme Court found that as between parties to the transaction, i.e. defendant and the third party, delivery of the goods was not essential to transfer of title.  See Holbird, 174 P.2d at 266.  As between plaintiff and defendant, however, the court found that because defendant had clothed the third party with indicia of title, i.e. an unconditional bill of sale, he was estopped from asserting title against plaintiff, who had detrimentally relied on the bill of sale.  See id.  In so finding, the court stated as follows:

> As to transfers and encumbrances of personal property generally, it is a general rule that an estoppel arises against the real owner where [it] clothes the person assuming to dispose of the property with the apparent title to it or with apparent authority to dispose of it, and where the person setting up the estoppel acts and parts with value or extends credit on the faith of such apparent ownership or authority.

See Holbird, 174 P.2d at 266 (quoting 46 Am. Jur. 627).

Manheim argues that these cases demonstrate that Oklahoma Auto is estopped from claiming any interest in the vehicles.  Specifically, Manheim asserts that because Oklahoma Auto assigned the car titles free and clear to Guthrie, it created the circumstances which enabled Guthrie to pledge the cars to Manheim and cause the loss.  The Court does not disagree that equitable estoppel might apply in this case.  Nevertheless, Manheim has not shown that it is entitled to judgment as a matter

---

[24]      Defendant admitted that he executed the bill of sale, but argued that the third party did not pay for the property as promised.

of law.  The summary judgment record is not sufficiently developed regarding whether Manheim

acted reasonably in loaning money to Guthrie based on the certificates of title.  Manheim claims that

lenders in the car industry customarily rely on certificates of title as proof of ownership, but it

presents no evidence regarding whether it followed other lending protocols in the industry.

Oklahoma Auto contends that Manheim should have known that no sale had occurred because the

bills of sale were unsigned and did not reflect the sales price.[25]  On this record, Manheim has not

shown that it is entitled to judgment as a matter of law.

> **d.     Whether Manheim Is Entitled To Summary Judgment Because It Qualifies As A Good Faith Purchaser Under Section 2-403(1).**

Manheim asserts that it is entitled to summary judgment based on 12A Okl.

St. Ann. § 2-403(1), because it qualifies as a good faith purchaser for value.  Section 2-403 provides

as follows:

> * * * A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though
> > (a) the transferor was deceived as to the identity of the purchaser, or
> > (b) the delivery was in exchange for a check which is later dishonored, or
> > (c) it was agreed that the transaction was to be a "cash sale", or
> > (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Id.  Although Manheim offers no analysis of the statutory language, it apparently invokes subsection

(b), where goods have been delivered in exchange for a check which is later dishonored.

To qualify as a good faith purchaser under Section 2-403(1)(b), Manheim must show that (1)

Guthrie had voidable title; (2) Manheim was a good faith purchaser for value; (3) the cars were

---

[25]     Oklahoma Auto alleges additional acts of negligence by Manheim, but it did not include those allegations in a statement of facts as required by D. Kan. Rule 56.1.  See, e.g., Oklahoma Auto's Opposition at 15-16.

delivered under a transaction of purchase; and (4) the delivery was in exchange for a check which was later dishonored. The undisputed facts establish the fourth requirement, i.e. that to the extent the cars were delivered, it was in exchange for a check which was later dishonored. Manheim, however, has not established the remaining requirements.

As to the first requirement, Manheim offers no legal analysis or authority to support the claim that Guthrie had voidable title. See Manheim's Memorandum (Doc. #56) at 18-20. The Court will not construct Manheim's argument in this regard. See e.g., Sholl v. Plattform Adver., Inc., 438 F. Supp.2d 1303, 1310 n.7 (D. Kan. 2006).

As to the second requirement, the U.C.C. defines "good faith" to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing." 12A Okl. St. Ann. § 1-201(20). Manheim asserts that it acted in good faith, but it provides no analysis of the factual record to support its assertion. See Manheim's Memorandum (Doc. #56) at 19. The facts demonstrate that Manheim did not know that Oklahoma Auto claimed an interest in the cars. See Manheim's Memorandum at 5, ¶ 16. Oklahoma Auto, however, contends that Manheim should have known that no sale occurred because the bills of sale were unsigned and did not reflect the sales price. See Oklahoma Auto's Response (Doc. #60) at 5-6, ¶ 16. Manheim presents no evidence regarding reasonable commercial standards of fair dealing and/or whether it followed those standards.[26] On this record, Manheim has not established as a matter of law that it acted in good faith. See, e.g., Chrysler Credit Corp., 853 P.2d at 1284 (summary judgment not appropriate where evidence of good faith either conflicting or absent).

---

[26]     Manheim has established that lenders in the car industry rely on certificates of title as proof of ownership, see id. at 7, ¶ 26, but it provides no evidence regarding commercial standards of fair dealing in the industry.

As to the third element, as discussed supra, the record reveals a genuine issue of material fact whether Oklahoma Auto delivered the cars to Guthrie.[27]  Manheim tries to get around this fact by arguing that under Oklahoma law, actual delivery is not required to transfer ownership to a bona fide purchaser.  See Manheim's Memorandum (Doc. #56) at 19-20.  In support of this argument, Manheim cites Holbird v. Harris, 174 P.2d 262 (Okla. 1946), and Kirkham v. B.F. Fullerton & Son, 122 P. 652 (Okla. 1912).  In Holbird, the Oklahoma Supreme Court found that where the owner of goods transferred title through an unconditional bill of sale (but without delivery), he was estopped from asserting title against a subsequent bona fide purchaser of the property.  See Holbird, 174 P.2d at 266.  In Kirkham, the Oklahoma Supreme Court found that where the dispute is between two parties to a contract, and no other rights are involved, the question of when title to property passed depends on the intention of the parties and is normally a question of fact for the jury.[28]  See Kirkham, 122 P. at 653.

Manheim contends that under Holbird and Kirkham, actual delivery of the cars was not required for it to acquire title as a good faith purchaser.  Both Holbird and Kirkham, however, were decided before Oklahoma adopted the U.C.C.  By its terms, Section 2-403(1)(b) applies only when "goods have been delivered under a transaction of purchase."  On this record, Manheim has not shown that Oklahoma courts would disregard the delivery requirement of Section 2-403(1)(b).  Manheim is not entitled to summary judgment on this ground.

---

[27]    Construed in a light most favorable to Oklahoma Auto, the record supports an inference that Guthrie took possession of two cars.  Manheim may be able to show that it qualifies as a good faith purchaser as to those cars.  On this record, however, it has not done so.

[28]    Manheim contends that under Kirkham, "where [the] intention of the parties to transfer title is clear, transfer of ownership is complete even if [the] goods remain undelivered." Manheim's Memorandum (Doc. #56) at 20.  Here, a genuine issue of material fact exists regarding when the parties intended to transfer ownership.

**2.     Oklahoma Auto's Motion For Summary Judgment On Conversion Claim**

Oklahoma Auto contends that it is entitled to summary judgment on the conversion claim because Manheim cannot show that it had a valid security interest in the cars.  Specifically, Oklahoma Auto asserts that Manheim did not acquire a security interest because (1) Oklahoma Auto obtained duplicate titles to the cars; and (2) Oklahoma Auto retained possession of the cars. Oklahoma Auto also asserts that to the extent Manheim may have acquired a security interest, it was unperfected under Oklahoma law.

**a.     Whether Oklahoma Auto Is Entitled To Summary Judgment Because It Obtained Duplicate Car Titles**

Oklahoma Auto asserts that because it obtained duplicate car titles, it owned the cars as a matter of law and Manheim did not acquire a security interest in them.  In support of its argument, Oklahoma Auto submits an affidavit by the deputy director of the motor vehicle division of the Oklahoma Tax Commission, which states, <u>inter alia</u>, that "[o]nly the most recent Oklahoma certificate of title is considered valid."  Exhibit 6 to <u>Oklahoma Auto's Brief</u> (Doc. #58). Based on this affidavit, Oklahoma Auto contends that its duplicate titles are valid and make void the original titles which Guthrie pledged to Oklahoma Auto.  <u>See</u> <u>Oklahoma Auto's Brief</u> (Doc. #58) at 6.  As an initial matter, Oklahoma Auto did not set forth facts to support its argument in a statement of facts, as required by D. Kan. Rule 56.1.  Second, even if the Court considered the additional facts, Oklahoma Auto obtained duplicate titles *after* Guthrie pledged the original titles to Manheim.  Oklahoma Auto argues that the original titles became void, but it does not address whether Manheim could have taken a valid security interest in the cars before the original titles allegedly became void.  Moreover, as discussed <u>supra</u>, the Court is not convinced that under

21

Oklahoma law, a certificate of title (or duplicate thereof), demonstrates conclusive proof of ownership. Oklahoma statutes provide a method to obtain a replacement title in case of a lost certificate of title. See 47 Okl. St. Ann. § 1108. The fact that Oklahoma Auto may have successfully convinced state authorities that it lost the car titles does not prove that as a matter of law, it retained ownership in the cars. Oklahoma Auto is not entitled to summary judgment on this ground.

> **b.** **Whether Oklahoma Auto Is Entitled To Summary Judgment Because It Retained Possession Of The Cars**

Oklahoma Auto asserts that Manheim did not obtain a security interest in the cars because it retained possession of the cars and they never became part of Guthrie's inventory. As discussed supra, the security agreement granted Manheim a security interest in, inter alia, Guthrie's "Vehicle inventory." Exhibit 1 to Oklahoma Auto's Response (Doc. #60). The agreement defines "vehicle" to mean "any motor vehicle of any kind," but it does not define the term "inventory." The U.C.C. defines "inventory" as, inter alia, goods which are "held by a person for sale or lease or to be furnished under a contract of service." 12A Okl. Stat. Ann. § 1-9-102(48)(B). Here, although Oklahoma Auto contends that it retained possession of the cars, the undisputed facts establish that (1) Guthrie took possession of two cars; (2) when Guthrie left Oklahoma Auto on February 27, 2006, he believed that he had the right to re-sell the cars at any time; and (3) Guthrie planned to keep the cars at Oklahoma Auto until he decided where to sell them. This evidence raises a genuine issue of material fact whether the cars became part of Guthrie's inventory.

The fact that Oklahoma Auto may have retained possession of the cars is not determinative. The court in Mitchell Coach Manufacturing Co. v. Stephens, 19 F. Supp.2d 1227 (N.D. Okla. 1998), rejected a similar argument. In Mitchell, a motor home manufacturer transferred the certificate of origin to a motor home dealer without recording its lien thereon. The manufacturer retained

22

possession of the motor home.  The dealer sold the home and applied for a certificate of title which reflected a first lien in favor of the purchaser's financing company.  The dealer received payment from the purchaser and remitted a check to the manufacturer, but the dealer's check was returned unpaid.  When the purchaser tried to pick up the motor home, the manufacturer would not release it, claiming that it still owned the motor home.  On cross motions for summary judgment, the court rejected the manufacture's claim, finding that under Oklahoma law, the certificate of title constituted presumptive proof of ownership which was not rebutted by mere possession of the motor home.  See id. at 1233-34.   The court further found that because the manufacturer had transferred an unencumbered certificate of origin, it created the circumstances which caused the loss.  See Mitchell, 19 F. Supp.2d at 1238.  Therefore, the manufacturer was estopped from claiming a superior property interest.  See id.

Like the manufacturer in Mitchell, Oklahoma Auto assigned unencumbered certificates of title to Guthrie but now claims that it retained possession and still owned the cars.  Under Mitchell, the fact that Oklahoma Auto retained possession of the cars does not show as a matter of law that it retained ownership of the cars.  Oklahoma Auto is not entitled to summary judgment on this ground.

        **c.**       **Whether Oklahoma Auto Is Entitled To Summary Judgment Because Any Security Interest Which Manheim Obtained In The Cars Was Unperfected Under Oklahoma Law**

Oklahoma Auto asserts that to the extent Manheim obtained a security interest, it was unperfected under Oklahoma law.  As an initial matter, Oklahoma Auto offers no legal authority or analysis to support its claim that any security interest held by Manheim must be perfected before Oklahoma Auto can be held liable for conversion.  See, e.g., White & Summers,

23

Uniform Commercial Code § 21-1(b) (perfection relevant only when secured creditor falls into conflict with third parties such as trustee in bankruptcy or other secured creditors).  Moreover, Oklahoma Auto has not shown that any security interest which Manheim may have obtained was unperfected.  In support of its argument, Oklahoma Auto cites 47 Okl. St. Ann. § 1110, which provides for perfection of a security interest in a vehicle by filing, inter alia, a lien entry form with the Oklahoma Tax Commission.  See Oklahoma Auto's Brief (Doc. #58) at 6.  The statute, however, expressly exempts a security interest in vehicles held by a dealer for sale or lease.  See 47 Okl. St. Ann. § 1110(A)(1).  Here, the undisputed facts establish that Manheim's security agreement covered Guthrie's "Vehicle inventory" and that Guthrie was a car dealer who planned to re-sell the cars.  On these facts, to the extent Manheim may have obtained a security interest in the cars, Section 1110 would not apply.  Oklahoma Auto is not entitled to summary judgment on this ground.

**B.      Civil Conspiracy**

Manheim claims that Oklahoma Auto is liable for civil conspiracy.  Specifically, Manheim claims that Guthrie and Oklahoma Auto conspired to obtain financing to cover Guthrie's post-dated checks and that in furtherance of the conspiracy, Guthrie falsely represented to Manheim that he had valid, unencumbered title to the vehicles.  See Pretrial Order (Doc. #49) at 17-18.  To prove civil conspiracy, Manheim must show (1) two or more persons; (2) an object to accomplish; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) proximate damages.  See Meyer Land & Cattle Co. v. Lincoln County Conservation Dist., 29 Kan. App.2d 746, 753, 31 P.3d 970, 976 (2001) (citing Stoldt v. City of Toronto, 234 Kan. 957, 967, 678 P.2d 153, 161 (1984)).[29]  The claim must be based on a valid, actionable underlying tort.  See id.

_____

[29]       The parties dispute whether Kansas law or Oklahoma law applies to this claim.
(continued...)

Oklahoma Auto seeks summary judgment, arguing that Manheim cannot show that it conspired with Guthrie to commit an unlawful act. Specifically, Oklahoma Auto argues that it lawfully obtained duplicate titles from the Oklahoma Tax Commission, and Manheim has not alleged that it violated any law in so doing. See Oklahoma Auto's Brief (Doc. #58) at 7-10.[30] The problem with Oklahoma Auto's argument is that it does not address Manheim's claim. Manheim does not allege that the parties conspired to unlawfully obtain duplicate titles. Manheim alleges that the parties conspired to unlawfully obtain financing by falsely representing that Guthrie had valid, unencumbered title to the vehicles, when in fact he did not. See Pretrial Order (Doc. #49) at 17-18. Oklahoma Auto's motion does not address this claim. On this record, Oklahoma Auto has not shown

---

[29](...continued)
Manheim asserts that Georgia law applies because it suffered injury in Georgia, but that the Court can apply Kansas law because no substantive difference exists between Kansas and Georgia law. See Manheim's Opposition (Doc. #62) at 26 n. 20; Manheim's Memorandum (Doc. #56) at 9. Oklahoma Auto asserts that Oklahoma law applies, but provides no meaningful analysis to support its assertion. See Oklahoma Auto's Brief (Doc. #58) at 7-10. Because this is a diversity case, the Court applies Kansas choice of law rules to determine which state's substantive law applies. See Mirville v. Allstate Indem. Co., 71 F. Supp.2d 1103, 1107 (D. Kan. 1999) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)). Kansas courts apply lex loci delicti, i.e. the law of the state where the tort occurred. See Ling v. Jan's Liquors, 237 Kan. 629, 634-35, 703 P.2d 731, 735 (1985). Where the tortious act occurs in one state but the resulting injury occurs in another state, Kansas courts apply the law of the state where the injury occurred. See id. Here, Manheim alleges that it suffered damages in Georgia as a result of Oklahoma Auto's acts in Oklahoma. Under lex loci delicti, Georgia law applies to the claim. Manheim asserts that the Court can apply Kansas law because no meaningful difference exists between Georgia law and Kansas law. The Court agrees. Cf. J. Kinson Cook of Georgia, Inc v. Heery/Mitchell, 644 S.E.2d 440, 448 (Ga. App. 2007) (civil conspiracy involves two or more persons acting in concert, engaged in conduct that constitutes tort); Meyer Land & Cattle, 29 Kan. App.2d at 753, 31 P.3d at 976. The Court will therefore apply Kansas law.

[30]    Oklahoma Auto asserts that the fact that it received duplicate titles shows that it was the "record owner" of the cars, and that it was "business savvy" to seek duplicate titles to protect its investment when Guthrie did not perform his agreement. Id. at 8-9. Oklahoma Auto contends that it did not know that Guthrie had obtained financing on the vehicles, that Guthrie recommended that it seek duplicate titles and that it acted legally in obtaining duplicate titles. See id. at 10.

that it is entitled to summary judgment on Manheim's conspiracy claim.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion For Partial Summary Judgment Against Defendant Oklahoma Auto Exchange As To Liability And Compensatory Damages On Count IV (Conversion) (Doc. #55) filed July 3, 2007 and Oklahoma Auto's Motion For Summary Judgment Against Plaintiff As To Sole Remaining Count IV (Conversion) And Count V (Civil Conspiracy), And Brief In Support (Doc. #58) filed July 13, 2007 be and hereby are **OVERRULED.**

Dated this 19th day of October, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

26